Bradley J. Luck
Leah T. Handelman
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Phone (406) 523-2500
Fax (406) 523-2595
bjluck@garlington.com
lthandelman@garlington.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MOUNTAIN WEST FARM BUREAU MUTUAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CRAIG A. NEESVIG and SHANA NEESVIG,<br><br>Defendants. | COMPLAINT FOR DECLARATORY JUDGMENT |

Plaintiff Mountain West Farm Bureau Mutual Insurance Company ("Mountain West"), by and through its counsel, Garlington, Lohn, & Robinson, PLLP, for its Complaint for Declaratory Judgment, states and alleges as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Mountain West is a corporation organized and existing under the laws of Wyoming and with a principal place of business in Albany County, Wyoming. Mountain West is an insurance company which is authorized to conduct business in Montana.

2. Defendants Craig Neesvig and Shana Neesvig (collectively "the Neesvigs") are residents of Trout Creek, Montana.

3. Mountain West issued Homeowners Policy Number 4HM44441 to the Neesvigs with a policy period from December 4, 2018, to December 4, 2019 ("Policy"). A true and correct copy of the Policy is attached as Exhibit A, with premium information redacted ("Ex. A").

4. The Neesvigs have demanded coverage under the Policy for claims and third-party counterclaims brought against them in an action styled: *Stephanie and Christopher Rash v. Craig Neesvig and Shana Neesvig v. Stephanie Rash, Christopher Rash, Neal Rash and Keren Rash v. Craig Neesvig and Shana Neesvig* pending in the Montana Twentieth Judicial District Court, Sanders County as Cause No. DV-19-91 ("Underlying Action").

5. The plaintiffs in the Underlying Action seek general, special, and punitive damages against the Neesvigs which exceed $75,000.00.

6. The actions giving rise to the allegations in the Underlying Action allegedly occurred in Trout Creek, Montana.

7. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because this matter in controversy exceeds $75,000.00 and the Plaintiff and the Neesvigs are citizens of different states.

8. Venue is proper in the Missoula Division of the District of Montana as the Neesvigs reside in Sanders County, the events giving rise to the Underlying Action occurred in Sanders County, and any judgment against the Neesvigs will be obtained in Sanders County pursuant to the Underlying Action further described below.

9. There is an actual justiciable controversy between Mountain West and the Neesvigs concerning their rights and obligations under the Policy.

## II. GENERAL ALLEGATIONS

10. The parties' rights and obligations under the Policy, specifically whether Mountain West has a duty to defend or indemnify the Neesvigs on the claims alleged against them in the Underlying Action, is the subject of this action.

**A. The Underlying Action**

11. On November 4, 2019, Stephanie and Christopher Rash (collectively referred to as "Original Rash Plaintiffs") filed a Complaint and Demand for Jury Trial in the Montana Eleventh Judicial District Court, Flathead County, against

Craig A. Neesvig. The Underlying Action was transferred to Sanders County after the Neesvigs filed a successful motion to change venue.

12. On August 24, 2020, the Original Rash Plaintiffs filed their First Amended Complaint.[1] A true and correct copy of the First Amended Complaint is attached as Exhibit B ("Ex. B") ("Underlying Complaint").

13. The allegations of the Underlying Complaint can be summarized as follows: In 2017 the Original Rash Plaintiffs purchased property in a remote area in Sanders County, Montana which abuts the property owned and resided on by the Neesvigs. According to the Underlying Complaint, the Original Rash Plaintiffs raised chickens on their property near the property line between their property and the Neesvig property.

The Underlying Complaint alleges that prior to April 18, 2019, the Original Rash Plaintiffs had negative interactions with the Neesvigs that allegedly interfered with the use and enjoyment of their land. These alleged interactions included Mrs. Neesvig coming to their home or calling to complain about the Original Rash Plaintiffs' dog barking; Mr. Neesvig allegedly attempting to convince Christopher Rash to not build a privacy fence on his property; and Mr. Neesvig allegedly

---

[1] The Original Rash Plaintiffs filed an opposed motion seeking leave to file a Second Amended Complaint on May 24, 2021. At the time of the filing of this Complaint, Mountain West has not been informed that the motion has yet been ruled on.

4

attempting to prevent the Original Rash Plaintiffs from accessing public land from their own property. Because of these alleged interactions, the Original Rash Plaintiffs placed video cameras throughout their property, including the areas abutting the Neesvig's property.

On April 18, 2019, Stephanie Rash left the property to attend a baseball game in Thompson Falls. Later that evening, Stephanie Rash's sister returned to the property and allegedly discovered scattered chicken feathers and missing chickens.

The Original Rash Plaintiffs allegedly reviewed the video footage from the previous day, which allegedly shows Mr. Neesvig entering the Original Rash Plaintiffs' property with a firearm and shooting five chickens to death on the property. The video footage also allegedly shows Mr. Neesvig beating one of the chickens to death with the butt of his rifle, and then taking all of the dead chickens back to his property. According to the Underlying Complaint, the Original Rash Plaintiffs called law enforcement, who found numerous rifle shell casings on the Rash property. Sometime after the incident with the chickens, one of Mr. Neesvig's pigs was found dead. The Underlying Complaint alleges that Mr. Neesvig confronted the Original Rash Plaintiffs, blaming them for the pig's death and alleged stating that he would "fucking kill them." The Underlying Complaint

further alleges that that on February 5, 2018, Shana Neesvig shot a small caliber gun towards Christopher Rash at his home.

Due to the incident with the chickens, the Original Rash Plaintiffs' sought and obtained a Temporary Order of Protection ("TRO") in Sanders County Justice Court on May 7, 2019. The Underlying Complaint alleges that Mr. Neesvig admitted to killing the chickens during the TRO hearing.

The Underlying Complaint further alleges that due to the Neesvigs' "threatening behaviors" and the "stress and emotional distress" caused by the Neesvigs, the Original Rash Plaintiffs made the decision to move to Flathead County. According to the Underlying Complaint, the fear instilled by the Neesvigs's actions forced Christopher Rash to quit his job to be near his family.

14. The Underlying Complaint alleges five counts against the Neesvigs and includes requests for punitive damages and attorneys' fees.

15. Count One of the Underlying Complaint is for Trespass/Conversion and alleges that Mr. Neesvig intentionally interfered with and permanently deprived them of their personal property by entering onto their land and killing the chickens. This count alleges that Mr. Neesvig's conduct resulted in a total loss of the full use and enjoyment of the Original Rash Plaintiffs' personal property.

16. Count Two of the Underlying Complaint is for Trespass to Chattel and also alleges Mr. Neesvig intentionally interfered with and permanently

6

deprived the Original Rash Plaintiffs of their personal property by entering onto their land and killing the chickens. This count alleges that the Original Rash Plaintiffs are entitled to the full market value of the personal property.

17. Count Three of the Underlying Complaint is for Intentional & Negligent Infliction of Emotional Distress and alleges that Mr. Neesvig purposely entered the Rashes' land and wielded and discharged a firearm capable of killing or maiming a human being which allegedly caused the Original Rash Plaintiffs to fear for their safety and suffer serious or severe emotional distress that was reasonably foreseeable.

18. Count Four of the Underlying Complaint is for Assault and alleges that Mr. Neesvig assaulted Christopher Rash when he threatened to "fucking kill" him while brandishing a firearm which allegedly caused harmful or offensive contact with intent to cause fear.

19. Count Five of the Underlying Complaint is for Nuisance and alleges that the Neeesvigs' conduct is injurious to health; indecent or offensive to the senses; or an obstruction to the free use of property so as to interfere with the comfortable enjoyment of the Original Rash Plaintiffs' property and causing them general and special damages in the form of emotional distress, stress related health conditions, diminished property value, diminished use and quiet enjoyment of their property, and interference with their quality of life.

20. The Neesvigs, through counsel, filed counterclaims alleging various complaints against the Original Rash Plaintiffs as well as against Christopher Rash's parents, Keren and Neal Rash (collectively referred to as "Rash Counter Plaintiffs").

21. On September 25, 2020, the Original Rash Plaintiffs and Rash Counter Plaintiffs filed an Amended Answer to Counterclaim/Third Party Complaint Against Third-Party Plaintiffs which alleges various counterclaims against the Neesvigs.[2] A true and correct copy of the Amended Answer to Counterclaim/Third Party Complaint Against Third-Party Plaintiffs is attached as Exhibit C ("Ex. C") ("Underlying Rash Counterclaim").

22. The Underlying Rash Counterclaim is brought by the Rash Counter Plaintiffs and can be summarized as follows: The Underlying Rash Counterclaim alleges that the Rash Counter Plaintiffs are also neighbors of the Neesvigs and have deeded rights to the same water spring as the Neesvigs. The Underlying Rash Counterclaim alleges that the Neesvigs have repeatedly harassed the Rash Counter Plaintiffs and made threats against their persons and property, including going on the Rash Counter Plaintffs' property late at night to complain about dogs barking

---

[2] The Rash Counter Plaintiffs filed an opposed motion seeking leave file First Amended Counterclaims on May 24, 2021. At the time of the filing of this Complaint, Mountain West has not been informed that this motion has yet been ruled on.

even when the dogs are not barking; Mrs. Neesvig allegedly shooting a gun toward Neal Rash; Mr. Neesvig allegedly threatening to turn off access to water and allegedly always confronting Neal Rash anytime he makes improvements near the road easement; the Neesvigs allegedly reporting the Rash Counter Plaintiffs to the Health and Sanitation Department falsely stating that Rashes' septic was not up to code; and the Neesvigs allegedly and falsely telling people in community that Rashes killed their pig and their dog resulting in the Rash children and grandchildren having been ridiculed at school and on the internet because of rumors. The Underlying Rash Counterclaim further alleges that on September 14, 2019, the Rash Counter Defendants found two dead mice in their water filtration system that they believe were placed there by the Neesvigs.

23. The Underlying Rash Counterclaim alleges four counts against the Neesvigs and includes requests for punitive damages and attorneys' fees.

24. Count One of the Underlying Rash Counterclaim is for Negligent and Intentional Infliction of Emotional Distress and alleges that the Neesvigs' continual harassment of the Rash Counter Plaintiffs is extreme, outrageous, and intentional and has caused them to suffer serious or severe emotional distress and other damages that were reasonably foreseeable.

25. Count Two of the Underlying Rash Counterclaim is for Assault and alleges that the Rash Counter Plaintiffs have suffered damages as a result of the

9

Neesvigs' threats against them, which are harmful or offensive and made with the intent to cause fear or apprehension of harmful and offensive contact.

26.   Count Three of the Underlying Rash Counterclaim is for Nuisance and alleges that the Neesvigs' conduct is injurious to health, indecent or offensive to senses or obstruction to free use of property so as to interfere with the Rashes comfortable enjoyment.  As a result, the Rash Counter Plaintiffs have alleged damages in the form of emotional distress, stress related health conditions, diminished property value, diminished use and quiet enjoyment of property, and interference with quality of life.

27.   Count Four of the Underlying Rash Counterclaim is for Defamation and alleges that the Neesvigs slandered the Rash Counter Plaintiffs when they falsely told neighbors and community members that the Rashes killed their pig and dog and that Mr. Neesvig threated Neal Rash with a gun, which caused the Rash Counter Plaintiffs to experience hatred, contempt, ridicule or obloquy and caused them to be shunned or avoided.

28.   The Neesvigs, through counsel, submitted the claims in the Underlying Complaint and Underlying Rash Counterclaim to Mountain West under the Policy on August 13, 2021.

29.   Mountain West issued a reservation of rights letter to the Neesvigs, under which it agreed to provide a defense for the allegations in the Underlying

10

Action under a complete reservation of rights. A true and correct copy of the reservation of rights letter to the Neesvigs dated September 23, 2021, is attached as Exhibit D ("Ex. D").

**B.      Relevant Policy Provisions**

30.     The Policy provides the following pertinent liability coverages under Section II – Personal Liability Coverages.

### Coverage F – Liability

"We" will pay all sums for which an "insured" is legally liable because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies. If coverage applies, "we" will:

1. Pay up to "our" limit of liability shown in the "Declarations"; and
2. Provide a defense at "our" expense with counsel of "our" choice. "We" may make any investigation and settlement of any claim or suit that "we" decide is appropriate.

"We" will not have any duty to defend any suit, pay any judgment or settle any claim for "bodily injury" or "property damage" to which this insurance does not apply.

### Coverage M – Damage to Property of Others

"We" will pay up to the limit shown in the "Declarations" for "property damage" to property of others caused by an "insured."

. . .

"We" have no obligation under Coverage M to provide a defense against any claim or suit brought against an "insured."

Ex. A. at 40.

31. Coverage F is subject to the following exclusions:

   **EXCLUSIONS APPLICABLE TO "BODILY INJURY" OR "PROPERTY DAMAGE"**

   "We" do not cover damages for "bodily injury" or "property damage" either actual or alleged arising out of any of the following:

   . . .

   11. **Criminal Acts.** Violation of a criminal law.

   . . .

   19. **Intended or Expected Loss.** Any loss that:
       a. Is intended, expected or directed by any "insured";
       b. Arises out of intentional or malicious acts of any "insured"; or
       c. Would reasonably be expected to result from intentional or malicious acts of any "insured."

       This exclusion applies whether or not the resulting "bodily injury" or "property damage":
       a. Is of a different sort, quality or extent than might have been initially expected or intended; or
       b. Is incurred to a different person, entity or property than initially expected or intended.

   . . .

   25. **"Personal and Advertising Injury."**

   . . .

   28. **Punitive/Exemplary.** Punitive, exemplary or multiples of damages, fines, penalties, assessments or any other such award or finding.

Ex. A at 41-44.

32. The following exclusions apply to Coverage M:

> "We" do not pay for damage to property:
> 1. If insurance is otherwise provided in this policy;
> 2. Caused intentionally by an "insured" who is thirteen (13) years of age or older;
> 3. To property other than a rental golf cart owned by or rented to an:
>    a. "Insured";
>    b. Tenant of an "insured"; or
>    c. "Resident" of "your" household.
> 4. Arising out of:
>    a. "Business" activities or professional services;
>    b. Any act or omission in connection with a premises an "insured" owns, rents, or controls other than the "insured location"; or
>    c. The ownership, maintenance or use of an "auto" or "aircraft."
>
> Coverage M is subject only to the above exclusions and not the Section II Exclusions.

Ex. A at 40.

33. The Policy contains the following relevant definitions:

   Throughout this policy, **"you"** and **"your"** mean:

   1. The "named insured" shown in the "Declarations"[.]

   .  .  .

   **"Bodily injury"** means bodily harm, sickness or disease, including required care, loss of services and death to a person caused by an "occurrence."

   .  .  .

13

**"Insured"** means:

1. "You":

    a. If "you" are an individual, "insured" also means "your" "relatives" or minors in the care of "you" or "your" "relatives," but only if they are "residents" of "your" household.

    . . .

**"Occurrence"** means:

. . .

2. Under Section II – Liability and Section V – Umbrella; an unexpected and unintended accident, including continuous or repeated exposure to conditions, which results in "bodily injury" or "property damage" during the policy period. All "bodily injury" and "property damage" arising out of a common cause and sequence of events resulting in a loss to a person, persons, entity or entities shall be considered the result of one "occurrence."

. . .

**"Personal and Advertising Injury"** means injury, including consequential injury, arising out any of the following offenses:
1. False arrest, detention, imprisonment or keeping a person against their will.
2. Malicious Prosecution.
3. Wrongful eviction from, wrongful entry into or invasion of right of occupancy of a dwelling, premises or room that a person occupies, if it is committed by "you" or on "your" behalf.
4. Oral or written publication, in any manner, of material that:
    a. Libels or slanders a person or entity.
    b. Disparages any person or entity's goods, products, or services.
    c. Violates a person's right of privacy.

14

      5.      Use of anyone's advertising idea in "your" advertisement.

      6.      Infringement on copyright, trademark, trade dress or slogan of another.

. . .

**"Property damage"** means physical injury to or destruction of tangible property. This includes resulting loss of use caused by an "occurrence."

Ex. A at 8-11.

34.    Other provisions, conditions, or exclusions in the Policy may also limit or preclude Mountain West's obligations under the circumstances presented.

### III.    COUNT I – DECLARATORY JUDGMENT

35.    Mountain West repleads and incorporates by reference Paragraphs 1-35 above.

36.    Mountain West has no duty to defend or indemnify the Neesvigs in the Underlying Action, in whole or in part due to one or all of the following reasons:

    a.    Because the gravamen of the Underlying Action is based on intentional conduct, some or all of the allegations against the Neesvigs in the Underlying Action do not constitute an "occurrence" as defined under the Policy. Therefore, the Policy provides no coverage for any such allegations.

      b.      The emotional distress claims against the Neesvigs do not allege "bodily injury" or "property damage" and therefore, the Policy provides no coverage for such claims.

      c.      Exclusion 11 – Criminal Acts, which bars coverage for any violation of a criminal law excludes coverage under Coverage F for some or all of the claims against the Neesvigs in the Underlying Action.

      d.      Exclusion 19 – Intended or Expected Loss which bars coverage for any loss that is either intended, expected or directed by any "insured," arises out of intentional or malicious acts of any "insured" or would reasonably be expected to result from intentional or malicious acts of any "insured" excludes coverage under Coverage F for some or all of the claims against the Neesvigs in the Underlying Action.

      e.      Exclusion 25 – Personal and Advertising Injury, which bars coverage for the wrongful entry into or invasion of right of occupancy of a dwelling, premises or room that a person occupies, if it is committed by "you" or on "your" behalf and which also excludes coverage for "oral or written publication, in any manner, of material that libels or slanders a person or entity" excludes coverage under Coverage F for some or all of the claims against the Neesvigs in the Underlying Action.

      f.      Exclusion 28 – Punitive/Exemplary Damages, which bars coverage for punitive/exemplary damages excludes coverage under Coverage F for any punitive or exemplary damages alleged against the Neesvigs in the Underlying Action.

      g.      Coverage M's Exclusion 1., which prohibits duplicate coverage for "property damage" excludes coverage under Coverage M for any alleged "property damage" caused by the Neesvigs in the Underlying Action to the extent coverage is available under Coverage F or elsewhere in the Policy

      h.      Coverage M's Exclusion 2., which bars coverage for damage to property caused intentionally by an "insured" who is thirteen (13) years of age or older excludes coverage under Coverage M for any "property damage" caused by the Neesvigs in the Underlying Action.

Other facts and circumstances documented during this proceeding may further limit Mountain West's duty to defend or indemnify Defendants.

## IV.   PRAYER FOR RELIEF

**WHEREFORE,** Mountain West requests the following relief:

1.      For Count I for Declaratory Judgment, for a judicial declaration that Mountain West has no duty to defend or indemnify, in whole or in part, in connection with the Underlying Action;

2. For recoupment of its defense costs, including attorneys' fees paid to defend the Underlying Action;

3. For pre-judgment and post-judgment interest; and

4. For such other relief as the Court deems just.

## V. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trail by jury for all issues so triable herein.

DATED this 3rd day of March, 2022.

                GARLINGTON, LOHN & ROBINSON, PLLP

                By   /s/  Leah T. Handelman
                     Attorneys for Plaintiff